UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:13-cr-00084-GEB |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT SHARMA'S MOTION TO SUPPRESS STATEMENTS** |
| SURJIT SINGH, et al., | |
| Defendants. | |

       Defendant Anita Sharma moves for suppression of statements she made during her communication with two Federal Bureau of Investigation ("FBI") Special Agents. Defendant argues her statements should be suppressed because when she made them she was in the FBI Special Agents' custody and had not been given warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); and that they should be suppressed because the methods used to extract them violated the principle in the Fifth Amendment to the United States Constitution which proscribes coerced self-incrimination. The United States ("Government") opposes the motion arguing it is untimely, and even if it is not denied on this ground it should be denied because Defendant was not in

1

custody at the time of the subject communications, and therefore the FBI Special Agents were not required to give her <u>Miranda</u> warnings, and the statements were voluntarily given.

## I. TIMELINESS

The Government argues the timeliness of the motion is governed by Local Rule ("Local Rule") 430.1 of this United States District Court, and under this rule "if [Defendant] wanted to move to suppress her statement[s], she [was required to file a motion] on or before April 26, 2013. The motion [was] filed more than four years later on September 10, 2017, [and] is untimely and should be denied." Gov't Opp. 4:25-27, ECF No. 95.

Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure ("Rule") prescribes that a motion to suppress evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Further, Rule 12(c)(1) prescribes: "The court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions and may also schedule a motion hearing. If the court does not set one, the deadline is the start of trial." Local Rule 430.1(c) prescribes "[a]ll pretrial motions shall be filed within twenty-one (21) days after arraignment unless a different time is specifically prescribed by the Court." EDCA L.R. 430.1(c). Defendant has not shown that Local Rule 430.1(c) should not be enforced. <u>See generally</u>, <u>United States v. Lustig</u>, 555 F.2d 737, 751 (9th Cir. 1977) (indicating that a district court may enforce its local rule "for submission of proposed instructions five days prior to trial . . . .").

1        The Government argues:

2            The court did not specifically prescribe a
         different time for the filing of suppression
3        motions and the deadline established by the
         Local Rule was April 26, 2013. Dkt. 9; EDCA
4        L.R. 430.1(c) (2017). [Defendant] did not
         file a suppression motion by that deadline.
5        [Defendant]'s counsel likewise did not seek
         an extension of that deadline or an alternate
6        briefing schedule before that deadline
         expired. Indeed, it was not until more than
7        four years later that defense counsel first
         raised this issue at the September 8, 2017,
8        trial confirmation hearing. The Court
         appropriately refused to set such a schedule
9        at trial confirmation.

10   Gov't Opp. 5:9-15, ECF No. 95.

11       Defendant contends her "motion to suppress is timely"

12   and, in any event, "that good cause exists for its filing." Mem.

13   Supp. Def.'s Req. Ct. Consider Her Mot. Suppress. 2:27, ECF No.

14   93-8. Defendant fails to support her conclusory contention that

15   her motion is timely in light of the Rule 12 motion deadline

16   prescribed in Local Rule 430.1. Defendant argues as follows that

17   application of Local Rule 430.1 would be unreasonable since she

18   has not exercised her right to a speedy trial:

19           In the case at bar, the notice of hearing and
         motion was filed six weeks prior to the start
20       of trial, and in advance of the motions in
         limine filing and hearing date. A practical
21       application of Local Rule 430.1 requiring
         pretrial motions within 21 days after
22       arraignment is reasonable when a defendant is
         asserting their 6th Amendment Speedy Trial
23       right, pursuant to Title 18 U.S.C. §
         3161(c)(1). Local Rule of the United States
24       District Court Eastern District of California
         430.1(c) (2017). Within the confines of
25       section 3161's seventy-day time limitation,
         twenty-one days provides the court, the
26       government, and the defendant procedural
         safeguards. In this case, time has been
27       excluded since the defendants were arraigned
         in this case. This Court should consider the
28       motion timely because the speedy trial clock

                                3

has not run and trial is still many weeks away.

Def.'s Resp. 4:17-5:2, ECF No. 96.

Defendant's argument does not justify disregarding the Rule 12 motion deadline in Local Rule 430.1(c). Nor has Defendant filed a motion to extend time in which to file a Rule 12 motion filed as required by Local Rule 430.1(f). Therefore, Defendant's suppression motion is untimely.

However, "a court may consider [an untimely Rule 12(b)(3) motion] if the party shows good cause." Fed. R. Crim. P. 12(c)(3). Defendant contends she has good cause justifying excusing her late motion, explaining:

> On March 14, 2013 the Government indicted [Defendant] . . . . Dkt. 1. On March 10, 2017 the court relieved [Defendant]'s prior attorney and undersigned counsel became the attorney of record for [Defendant] in this action. Dkt. 82. At the March 10, 2017 hearing, the government provided defense counsel with more than 11,000 pages of discovery. Declaration of Charles Woodson ("Decl. Woodson"), ¶ 2 filed on September 10, 2017. Between March of 2017 and September of 2017, undersigned counsel reviewed the discovery with [Defendant] using a court-certified Punjabi interpreter. On September 8, 2017 counsel informed the court of [Defendant]'s intent to file a motion to suppress. Id. ¶ 6.

Mem. Supp. Def.'s Req. Ct. Consider Her Mot. Suppress. 1:24-2:5, ECF No. 93-8. Defendant further argues:

> [T]he Court should find good cause to allow the motion to be heard based on counsel's diligence combing through the voluminous discovery and the significance of the Constitutional right involved. Furthermore, the significant prejudice that [Defendant] would face if this motion is not considered and heard because of her prior counsel's failure to file it, far outweighs any argument by the government that it would be

4

judicially inefficient to consider it at this late stage. The volume of discovery and the continued production of discovery that is produced in a non-text searchable format cannot be quickly digested. To adequately review the discovery with a Punjabi speaking client requires coordinating schedules and cannot always be quickly accomplished. With motions in limine still to come and a hearing on those motions in limine that may require evidentiary hearings, the timing of the motion to suppress may pose a slight burden the court's calendar but the failure to hear the motion will certainly have a prejudicial effect on [Defendant]'s ability to preserve her rights at trial.

Def.'s Resp. 5:3-13, ECF No. 96.

The Government counters, arguing:

Good cause does not exist to excuse Defendant's failure to comply with a deadline that expired more than four years ago. The only excuse Defendant offers for this delay was that new counsel needed to review discovery when he substituted into this case in March of 2017. Dkt. 93-8 at 3. (citing Fed. R. Crim. P. 12). That excuse does not establish good cause. Indeed, that argument completely ignores the fact that Defendant was represented by counsel at all times after indictment, including when she was arraigned on April 5, 2013, when her lawyer was given a copy of her confession on April 12, 2013, and when the deadline for the suppression motion expired on April 26, 2013. . . . Throughout those four years, Defendant never requested to file a suppression motion or amend the deadline.

Moreover, the fact that new counsel substituted into the case on March 6, 2017, also does not establish the requisite good cause. Defendant does not cite any authority claiming that the deadline was renewed when new counsel was retained. Dkt. 93-8. Additionally, although new counsel was provided a copy of his client's confession the day before he substituted into this case, he did not immediately seek relief to file a belated suppression motion. Instead, he waited six months before raising this issue for the first time to the court at the trial confirmation hearing. Such delay is

5

1        inexcusable and cannot establish good cause.

2        Defendant argues that she will suffer
         prejudice if the Court finds her motion
3        untimely. Dkt. 93-8 at 3. As an initial
         matter, that is not true as her Motion is
4        without merit. In addition, an argument that
         the Defendant would suffer prejudice does not
5        establish good cause or constitute a
         legitimate basis to consider a motion four
6        years after the deadline has passed. If that
         was the standard, deadlines would be
7        meaningless as defendants could always argue
         they would be prejudiced if their confessions
8        were admitted into evidence.

9   Gov't Opp. 5:16-6:10, ECF No. 95.

10        Defendant has not shown good cause for the untimely

11   suppression motion sub judice. Therefore, the motion is denied

12   because it was not timely filed and sufficient justification for

13   the late filing has not been provided. However, even assuming

14   that the merits of the motion should be determined, it will be

15   denied for the following reasons.

16                            **II. MERITS**

17        Decision on Defendant's contentions that his statements

18   should be suppressed hinges on whether he was in the custody of

19   the Special Agents when he gave the statements or on whether the

20   statements were voluntary within the meaning of the Fifth

21   Amendment's self-incrimination clause.

22        **A. Factual Suppression Record**

23        The "essential [factual] findings," Fed. R. Crim. P.

24   12(d), pertinent to decision on the motion are the following. On

25   August 3, 2010, FBI Special Agents Benjamin Paulin ("Special

26   Agent Paulin") and Gail Paresa ("Special Agent Paresa";

27   collectively "Special Agents") drove to Defendant's home to

28   interview her about matters underlying the instant case. Decl.

Benjamin Paulin ("Paulin Decl.") ¶ 4, ECF No. 95-1. Defendant was not home. The Special Agents subsequently drove to Gardner Family Health Network ("Gardner") in Gilroy, California, where Defendant worked as a Dental Assistant. Id. ¶¶ 4-5; Decl. Anita Sharma ("Def.'s Decl.") ¶¶ 2-3, ECF No. 96-1. However, Defendant was assisting a patient, Def.'s Decl. ¶ 4, and the Special Agents therefore departed the premises, Paulin Decl. ¶ 7, after leaving a business card, Def.'s Decl. ¶ 5. Subsequently, Defendant called Special Agent Paulin, a little before 11 a.m. that morning, and they scheduled a time to speak later that day. Paulin Decl. ¶ 7; see also Def.'s Decl. ¶ 6 ("I do not have a specific memory of calling the agents on the telephone, but I do remember them returning to my workplace to speak with me during a time I was available.").

The Special Agents returned to Gardner later that day, entered the building, and eventually "walked with [Defendant] to the break-room in [her] office where [she] proposed the meeting take place." Def.'s Decl. ¶ 7. The Special Agents "indicated to [Defendant] that they preferred to conduct [the] meeting privately." Id.; see also Paulin Decl. ¶ 13 ("[The Special Agents] suggested that the interview take place in [Special Agent Paulin's] vehicle."); Decl. Gail Paresa ("Paresa Decl.") ¶ 6, ECF No. 95-2; ("[The Special Agents] asked [Defendant] whether [they] could talk in Special Agent Paulin's car."). The Special Agents were dressed in suits, and their weapons were not visible. Paresa Decl. ¶ 11; Paulin Decl. ¶ 11. They "walked with [Defendant] from the break room to their unmarked car, which was parked in the off street parking lot next to the building."

Def.'s Decl. ¶ 8; Paulin Decl. ¶ 13 ("[Defendant] agreed to the interview in the vehicle and went to the vehicle . . . ."). "[Defendant] . . . agreed to be interviewed in the vehicle. [The Special Agents] never said [Defendant] had to talk with [them]. [They] never ordered [Defendant] to speak with [them] or go into the vehicle." Paulin Decl. ¶ 8. "There were no indications that it was a police vehicle. For example, there was no cage or outward markings." Paresa Decl. ¶ 9; see also Paulin Decl. ¶ 16. "The doors of the vehicle were unlocked . . . ." Paulin Decl. ¶ 17.

"[Defendant] sat in the back of the car . . . , [Special Agent Paulin] sat next to her . . . , [and] Special Agent Paresa sat in the front seat." Paulin Decl. ¶ 18; see also Paresa Decl. ¶ 16. "[Special Agent Paulin] did most of the questioning and took notes. Special Agent Paresa asked a few questions and took down a few statements made by [Defendant] during the course of the interview." Paulin Decl. ¶ 19; see also Paresa Decl. ¶ 17. The Special Agents did not tell Defendant "that [she] did not have to answer their questions" or that "she was free to go or end the interview at any time," Def.'s Decl. ¶ 9, but they also "never told [Defendant] that she was under arrest or that she was not free to go," Paresa Decl. ¶ 10; see also Paulin Decl. ¶ 20. "[The Special Agents] never touched [Defendant,] and she was never restrained in any manner." Paulin Decl. ¶ 14; see also Paresa Decl. ¶ 15.

The interview lasted "approximately one hour." Def.'s Decl. ¶ 9; see also Paresa Decl. ¶ 14 ("forty-five minutes to an hour"); Paulin Decl. ¶ 20 ("forty-five minutes to an hour").

"[The Special Agents] did not . . . raise [their] voices during the interview." Paulin Decl. ¶ 21. "[They] calmly and politely asked questions and [Defendant] answered the questions." Paresa Decl. ¶ 20; see also Paulin Decl. ¶ 21; Mot. Suppress Statements 8:16-23, ECF No. 93 (conceding "the Agents demeanor and communications may have been cordial" and that questions may have been asked "in a casual tone"). Some of the questions related to documents, which Special Agent Paulin showed Defendant during questioning. Paulin Decl. ¶ 22; see also Paresa Decl. ¶ 20. Defendant "never asked for a lawyer," but she did ask "whether she needed legal representation." Paulin Decl. ¶ 29; see also Paresa Decl. ¶ 13. "[Special Agent Paulin] told her that [he] could not provide her with any legal advice." Paulin Decl. ¶ 29; see also Paresa Decl. ¶ 13. "During the course of the interview, [Special Agent Paresa] presented [handwritten summaries of Defendant's] statements to her." Paresa Decl. ¶ 17. Special Agent Paresa had Defendant "initial[] next to each statement." Id. Special Agent Paresa also gave Defendant "the opportunity to correct each of the statements before initialing." Id. "At the end [of the interview], [Special Agent Paresa] gave [Defendant] the entire document to sign." Id. That document "did not include every question that was asked and every answer that [Defendant] gave [the Special Agents]." Def.'s Decl. ¶ 12. The Special Agents did not tell Defendant she "did not have to sign the document." Id.

"About halfway through questioning [Special Agent Paulin] told [Defendant] not to lie," Def.'s Decl. ¶ 10, to "take this seriously," Paulin Decl. ¶ 23, or that "this [is] a serious

9

matter," Paresa Decl. ¶ 21, in response to an answer in which he felt Defendant was withholding information, Paulin Decl. ¶ 23. Special Agent Paulin told Defendant "that [she] could go to jail for 30 years," Def.'s Decl. ¶ 10, or that "it appeared [Defendant] had committed a crime," Paulin Decl. ¶ 23. "[Defendant] then became very emotional and cried. [The Special Agents] questioned [Defendant] while [she] cried and after [she] stopped crying." Def.'s Decl. ¶ 10. Defendant also told the Special Agents several times that she "had to return to work but each time [they] told [her] they had more questions." Def.'s Decl. ¶ 11. Defendant declares "[she] did not feel like [she] had the ability to leave until they considered themselves done with their questions." Id. Special Agent Paresa avers that "[Defendant] could have left at any time and gone back into her place of employment." Paresa Decl. ¶ 7. Defendant was not arrested after the interview. Id. ¶ 14.

Defendant's motion also contains evidence on what she contends are her individual characteristics which she opines are relevant to her contention that her statements were the product of law enforcement coercion, and therefore were voluntary within the meaning of the Fifth Amendment's due process clause.

"Punjabi is [Defendant's] primary language," and she has "always spoken [Punjabi] at home." Def.'s Decl. ¶ 17. Defendant has failed "the Dental Board of California's Registered Dental Assistant Law and Ethics exam," and states that this is because "[she] did not understand all of the questions written in English." Id. ¶ 16. Defendant's attorney also declares he "reviewed the discovery with [her] using the services of a Court

certified Punjabi interpreter," Decl. Charles J.S. Woodson ¶ 4, ECF No. 93-1, and Defendant avers she "used a Court certified Punjabi interpreter to review and execute" the declaration in which she set forth her version of these events, Def.'s Decl. ¶ 18. However, during the interview "[Defendant] . . . responded [to questions] in English"; "spoke very good English"; "never said that she had difficulty speaking English"; and "never said she needed an interpreter." Paresa Decl. ¶ 18; see also Paulin Decl. ¶ 24 ("[Defendant] spoke English to us. She answered questions in English. . . . At no time, did she tell us that she could not speak or read English. She never once asked for an interpreter."). Special Agent Paulin later interviewed Defendant's former employer at Gardner. Paulin Decl. ¶ 33. The employer stated that during her employment "[Defendant] interacted with clients and staff in English," and that "the ability to read and write in English was a requirement of the job." Id. "She spoke English and wrote in patients' charts in English." Id. "[A]n individual who prepared tax returns for [Defendant] . . . said that . . . in the time period of 2006-07, [Defendant] spoke and read English." Id. ¶ 34.

Defendant also attaches police reports to her motion documenting domestic violence of which she was the victim. Ex. D—Police Records, ECF No. 93-5. Defendant indicates in her motion that this violence had a bearing on the voluntariness of her statements. Mot. Suppress Statements 6:22-7:6. The earliest record is from October of 1998 and establishes that Defendant requested a ride to a Gilroy police station to meet with an organization representative who could arrange alternate housing

for her; and also that she was unwilling to pursue her husband's prosecution. Id. at 2. In later incidents, Defendant received emergency protective orders. See, e.g., Id. at 3, 6, 8. A report of a May 2005 domestic violence incident evinces that Defendant's husband had been arrested several times for the domestic violence incidents and convicted of a related crime on at least one occasion. Id. at 7. Defendant's husband was also arrested for the May 2005 incident. Id. at 8. Only one of the reports mentions the presence of someone for language translation purposes. Id. at 5.

## B. Miranda: Custody Determination

Defendant argues she was in the Special Agents' custody when she communicated with them. "Once law enforcement officers take suspects into custody, [under the holding in Miranda,] the officers may not interrogate the suspects without first exercising certain procedural safeguards, including informing the suspects of their rights to remain silent and to have an attorney present." United States v. Washington, 462 F.3d 1124, 1132 (9th Cir. 2006) (citing Miranda, 384 U.S. at 444).

> "Miranda . . . sweeps more broadly than the Fifth Amendment itself. . . . The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony. Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda."

Oregon v. Elstad, 470 U.S. 298, 306-07 (1985). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the

12

ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). "A defendant is in custody if a 'reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.'" United States v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009) (quoting United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981)). "The custody determination is objective and is not based upon 'the subjective views of the officers or the individual being questioned.'" Id. (quoting United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002)). The Ninth Circuit has "identified five factors relevant to the custody determination: '(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'" Id. (quoting Kim, 292 F.3d at 974).

In the Ninth Circuit, which party bears the burden of showing a defendant was in custody at the time of questioning is an unresolved question. The Government cites a discussion of Bassignani, 560 F.3d 989 (9th Cir.), opinion amended and superseded on denial of reh'g, 575 F.3d 879 (9th Cir. 2009), in which the Ninth Circuit amended its opinion and removed discussion allocating the burden to defendants. See Gov't Opp. 7 n. 2. Although there is no in-circuit precedent, the Government cites Fifth and Eighth Circuit decisions that place the burden on

a defendant. Id. at 6:24-7:2 (citing United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989); United States v. Davis, 792 F.2d 1299, 1308 (5th Cir. 1986)). Defendant does not cite any authority, but argues: "Understanding that they wield a great amount of control over the situation, it is only reasonable that, especially in situations where they decide not to issue Miranda warnings, [the Government] then shoulder[s] the burden of proving that the encounter was not custodial." Def.'s Resp. 6:18-8:20. The question of who bears the burden will not be resolved here because, even assuming the Government bears the burden, the Government has satisfied that burden.

The Ninth Circuit first adopted an early formulation of the relevant considerations Bassignani applies in Lowe v. United States, 407 F.2d 1391, 1397 (9th Cir. 1969), which adopted them from the California Supreme Court, People v. Arnold, 426 P.2d 515 (Cal. 1967). The factors were later reformulated by United States v. Luther, 521 F.2d 408, 410 (9th Cir. 1975) (citing Lowe, 407 F.2d at 1397), and further refined in United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985), which made slight linguistic alterations and placed the factors in their now-familiar enumerated list.

The first Wauneka factor is "the language used to summon the individual." 770 F.2d at 1438. Defendant argues:

> [Defendant] asked the agents to have a meeting in her office's break-room but the agents declined . . . . The agents took [Defendant] to their duty vehicle where [Defendant] was isolated from her co-workers and kept in the private company of the agents. The duty vehicle was parked in an off-street parking lot. Though, [Defendant] may not have been handcuffed and though she

14

> may not have been officially "under arrest,"
> the agents did not expressly make a point to
> notify her that the doors of the car would
> remain unlocked and that she was free to
> leave at any point during the interview.
> Most tellingly, when [Defendant] told the
> agents she had to go back to work, rather
> than immediately, and without further
> question, ending the interview, the agents
> kept asking her questions. Their behavior
> indicated that [Defendant] was not, in fact,
> free to leave. Furthermore, through both
> their words and their actions, [Defendant]
> did not believe she could exit the car until
> she signed the agents' document.

Def.'s Resp. 7:11-21. The Government counters:

> The special agents told [Defendant] that they
> would like to speak with her. They did not
> demand to speak with her. They did not
> remove her from her place of employment while
> she was working. Prior to the meeting, the
> Defendant and Special Agent Paulin arranged a
> time to talk. The interview was done during
> a break from work and the Defendant went back
> to work signaling it was going to be of
> limited duration. Unlike in Bassignani,
> Defendant was not instructed or ordered to go
> with the special agents. Bassignani, 575
> F.3d at 884. She voluntarily went with the
> special agents understanding that questioning
> would ensue. Kim, 292 F.3d at 974.

Gov't Opp. 9:11-17. This factor concerns the communication the
Special Agents used to initiate the encounter. Bassignani, 575
F.3d at 884 ("Here . . . the detectives, after approaching
Bassignani from behind and asking him to 'remove himself from the
computer,' 'instructed' Bassignani to go to the conference room.
An 'instruction' is short of an 'order,' but it is plain that
Bassignani did not voluntarily 'agree to accompany' the officers
to the conference room."). The declarations in this case make
clear that while Defendant "proposed the meeting take place [in
the office break room]," Def.'s Decl. ¶ 7, "[the Special Agents]
asked [Defendant] whether [they] could talk in Special Agent

15

Paulin's car" instead, and "[Defendant] . . . agreed to be interviewed in the vehicle. [The Special Agents] never said [Defendant] had to talk with [them]. [They] never ordered [Defendant] to speak with [them] or go into the vehicle." Paulin Decl. ¶ 8. This factor weighs against a finding that Defendant was in custody.

The second Wauneka factor is "the extent to which the defendant is confronted with evidence of guilt." 770 F.2d at 1438. Defendant argues:

> During the interrogation, the agents presented [Defendant] with a number of documents. The agent told her he believed she committed a crime. The nature of the questions and circumstance prompted [Defendant] to ask the agents if she needed legal counsel. [Defendant] became emotional and cried during the encounter with the agents. [Defendant] began to cry when the agents told her not to lie and suggested that she could go to jail for 30 years.

Def.'s Resp. 7:23-8:4. The Government counters:

> After taking a break from work and voluntarily going with the agents, Defendant . . . was politely and cordially asked questions and she answered them. She was shown documents that were involved in her fraud but she was not confronted with them. To the contrary, she answered questions about them willingly. She was not threatened or tricked. The special agents "did not attempt to challenge [Defendant's] statements with other 'known facts' suggesting [her] guilt, they merely asked [her] questions about the allegations." United States v. Norris, 428 F.3d 907, 912 (9th Cir. 2005). The only issue on which the agents challenged [Defendant] concerned the identity of Surjit as they felt she was not being forthcoming. However, even in that part of the interview she was not challenged with evidence of her guilt but was simply told this was a serious matter and one of the agent's believed she had committed a crime.

Gov't Opp. 9:22-10:5. The focus concerning the degree of confrontation with evidence of guilt factor includes evaluation of whether law enforcement officers' communications were "aggressive, coercive, [or] deceptive." Bassignani, 575 F.3d at 884. This is an objective enquiry. Id. at 883. In this case "[the Special Agents] did not . . . raise [their] voices during the interview." Paulin Decl. ¶ 21. "[They] calmly and politely asked questions and [Defendant] answered the questions." Paresa Decl. ¶ 20; see also Paulin Decl. ¶ 21; Mot. Suppress Statements 8:16-23. Some of the questions related to documents, which Special Agent Paulin showed Defendant in connection with those questions. Paulin Decl. ¶ 22; see also Paresa Decl. ¶ 20. Defendant does not contend that the Special Agents were deceptive or otherwise lied. At one point, Special Agent Paulin did confront Defendant more forcefully. "[Special Agent Paulin] told [Defendant] not to lie," Def.'s Decl. ¶ 10, to "take this seriously," Paulin Decl. ¶ 23, or that "this [is] a serious matter," Paresa Decl. ¶ 21, in response to an answer in which he felt Defendant was withholding information, Paulin Decl. ¶ 23. He told Defendant "that [she] could go to jail for 30 years," Def.'s Decl. ¶ 10, or that "it appeared [Defendant] had committed a crime," Paulin Decl. ¶ 23.

Guidance for determination of this factor is provided in Bassignani, where the District Court found "that Bassignani was 'extensive[ly] questioned about evidence of [his] guilt;'" however the Ninth Circuit "disagree[d] with [the District Court's] legal conclusion that [this factor] weigh[ed] in favor of finding Bassignani was in custody." 575 F.3d at 885.

Considering the totality of the interview, which contains one confrontational interlude that does not contaminate the whole interview, this factor weighs against finding Defendant in custody.

The third <u>Wauneka</u> factor is "the physical surroundings of the interrogation." 770 F.2d at 1438. Defendant argues:

> The Agents took [Defendant] out of her office and questioned her while she was isolated in their duty vehicle for more than 45 minutes. The agents never offered [Defendant] the assistance of an interpreter. [Defendant] told the agents that she had to go back to work, yet the agents continued to question her. When [Defendant] asked if she needed legal counsel, the agents continued to question her. At the end of the interview Agent Paresa gave [Defendant] a document to sign and [Defendant] did not feel she could leave the car until she signed the document.

Def.'s Resp. 8:6-11. The Government counters:

> The Defendant was questioned right outside her place of employment in a public parking area for her convenience. The Ninth Circuit has held that an interrogation conducted in familiar surroundings weighs against finding that the Defendant was in custody. <u>Bassignani</u>, 575 F.3d at 885 (citing <u>United States v. Eide</u>, 875 F.2d 1429, 1437 (9th Cir. 1989)). Defendant was not isolated and at any time could have returned to her place of employment where there were not any agents or officers. The vehicle was a normal car without police markings, cages, or gun racks. The agents did not have any weapons visible. The doors of the vehicle were not locked and the Defendant was not handcuffed, as would have been the case if she had been arrested. After the interview was done during her break, she was able to leave and go back to work.
>
> Courts have held that questioning a person in the back of a police vehicle does not put her in custody for purposes of giving <u>Miranda</u> warnings. <u>See</u> <u>Burlew v. Hedgpeth</u>, 448 Fed. Appx. 663, 664-65 (9th Cir. 2011) (unpublished) (upholding state court's

18

determination that defendant was not in custody when sitting in back of patrol car as he was not handcuffed and not told he was under arrest and the interrogation was nonconfrontational); United States v. Jones, 523 F.3d 1235, 1235-42 (10th Cir. 2008) ("it was perfectly sensible for [officer] to be cognizant of Jones's privacy and ask to speak inside his car, thus preventing passerby from learning of Jones's methamphetamine use"); United States v. Murray, 89 F.3d 459, 462 (7th Cir. 1996) (holding defendant not in custody when questioned in back of squad car); United States v. Boucher, 909 F.2d 1170, 1173-74 (8th Cir. 1990) (same); United States v. Hudgens, 798 F.2d 1234, 1237 (9th Cir. 1986) (fact that defendant's voluntary statements made in a police car did not render them inadmissible). The Ninth Circuit has held that a defendant was in custody when he was "questioned by an FBI agent while sitting handcuffed in the back of a police car." United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993). However, this case is distinguishable as [Defendant] was never handcuffed or not allowed to leave.

Gov't Opp. 10:8-11:2.

Defendant was interviewed in an unmarked law enforcement vehicle "parked in the off street parking lot next to the [Gardner] building." Def.'s Decl. ¶ 8. This arrangement may be more familiar than some alternatives, but the Special Agents still controlled the space in which the interaction occurred. The Ninth Circuit observed in Burlew that the question of whether a defendant was in custody in the back of a police car could be a "close" question. Burlew, 448 Fed. Appx. at 664 (unpublished). The Ninth Circuit found important in Burlew that "Burlew was not handcuffed," and "that [the officer's] interaction with Burlew was nonconfrontational." Id. In light of the foregoing, the physical surroundings of the interrogation are a neutral factor, not weighing in favor of a finding for or against custody.

The fourth <u>Wauneka</u> factor is "the duration of the detention." 770 F.2d at 1438.  Defendant argues only that

> [i]nstead of posing questions to [Defendant] in the familiar setting of the breakroom at her office, it was the agents who urged that the questioning take place in their car. Without the benefit of a Miranda warning, sitting in the isolated setting of a government car, [Defendant] was questioned for at least 45 minutes.

Def.'s Resp. 8:14-17.  The Government counters:

> Both Special Agents recall the interview lasting 45-60 minutes.  As [Defendant] was taking a break from work, the interview was going to have limited duration.  Without any evidentiary support, Defendant's Motion claims that the duration was "more than 60 minutes."  Motion at 3.  The Ninth Circuit has found a defendant not in custody when he was questioned for "more than one hour," <u>United States v. Crawford</u>, 372 F.3d 1048, 1052 (9th Cir. 2004), and "approximately 45 minutes," <u>Noriss</u>, 428 F.3d at 911; <u>cf.</u> <u>United States v. Haswood</u>, 350 F.3d 1024, 1027 (9th Cir. 2003) (in assessing whether a confession was involuntary stating "[e]ven if we assume that the interrogation lasted all day, . . . . coercion typically involves far more outrageous conduct"). In contrast, the Ninth Circuit has found a defendant in custody when she was interrogated for 45 to 90 minutes. <u>Kim</u>, 292 F.3d at 972; <u>see also</u> <u>United States v. Beraun-Perez</u>, 812 F.2d 578, 579 (9th Cir. 1987) (accused was in custody during an interrogation that lasted between half an hour and an hour and a half). In another case, the court found the defendant was not in custody after a two-and-a-half hour interrogation although the court stated that length weighed in favor of finding the defendant was in custody as it was "at the high end." <u>Bassignani</u>, 575 F.3d at 886. Given that [Defendant]'s interview lasted was (<u>sic</u>)somewhere between 45 minutes to an hour, this factor is neutral on the issue as to whether the Defendant was in custody.

Gov't Opp. 11:6-20.  This factor does not weigh in favor of or against finding Defendant was in custody.

The final Wauneka factor is "the degree of pressure applied to detain the individual." 770 F.2d at 1438. Defendant omits discussion of this factor. See Def.'s Resp. 8. In Bassignani, when considering this factor, the Ninth Circuit evaluated whether the defendant was told he was free to go or that he was not under arrest and whether he was restrained. Id. at 886.

The Government argues:

> The Defendant was not pressured. The Defendant was never told that she was under arrest. She was not threatened. She was never taken away from her place of employment. The interview was prearranged. The doors of the vehicle where the interview took place were always unlocked. She was never touched or physically restrained. The agents did not restrain her freedom of movement at all, let alone to the degree associated with a formal arrest.

Gov't Opp. 11:23-27. As in Bassignani, Defendant was never explicitly told she was free to go at any time and she was never restrained, but in Bassignani "[the officer] . . . emphasize[d] in the first two minutes of the interview that Bassignani was not under arrest and would not be arrested." 575 F.3d at 886. The Special Agents in the instant matter were silent about the arrest issue and whether Defendant could leave at any time. This factor too is neutral as to the custody determination.

Although only two of five factors weigh against a finding that Defendant was in custody, no factor favors an in-custody finding. In Bassignani, three factors weighed against finding the defendant was in custody during questioning, but two factors favored an in-custody finding. 575 F.3d at 884-86. The Bassignani court found the defendant was not in custody.

"[B]ased on a review of the totality of the circumstances" the facts do not "show a 'restraint on freedom of movement of the degree associated with a formal arrest.'" Id. at 887 (quoting Kim, 292 F.3d at 973). This is not a case where "a reasonable innocent person . . . would conclude that after brief questioning [she] would not be free to leave." Kim, 292 F.3d at 978 (alteration in original) (quoting Booth, 669 F.2d at 1235).

### C. Voluntariness

Defendant also argues her statements should be suppressed because they were the involuntary product of governmental coercion. "[N]oncustodial interrogation . . . , by virtue of some special circumstances, [might] be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . .'" Beckwith v. United States, 425 U.S. 341, 347-48 (1976) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). "[W]herever a question arises whether a confession is incompetent because [it was] not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself [or herself].'" Missouri v. Seibert, 542 U.S. 600, 607 (2004) (quoting Bram v. United States, 168 U.S. 532, 542 (1897)). "A parallel rule governing the admissibility of confessions in state courts emerged from the Due Process Clause of the Fourteenth Amendment," and the "Fifth and Fourteenth Amendment voluntariness tests" are now unified. Id. at 607.

"In evaluating voluntariness, the test is whether,

considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Bautista, 362 F.3d 584, 589 (9th Cir. 2004) (quoting United States v. Male Juvenile, 280 F.3d 1008, 1022 (9th Cir. 2002)). "The government must prove that a confession [was] voluntary by a preponderance of the evidence." United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting Lego v. Twomey, 404 U.S. 477, 489 (1972)).

> In determining whether a defendant's will was overborne in a particular case, [a c]ourt . . . assesse[s] the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (internal citations and footnote omitted). The voluntariness cases do not

> [t]urn[] on the presence or absence of a single controlling criterion; each reflect[s] a careful scrutiny of all the surrounding circumstances. . . . [The] Due Process Clause [does not] require[] the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, [are] certainly factors to be evaluated in assessing the 'voluntariness' of an accused's responses, they [are] not in and of themselves determinative.

Id. at 226-27 (internal citations omitted).

Defendant cites several cases in her motion, but her

arguments often conflate the voluntariness question with custody arguments.  See generally Mot. Suppress Statements, ECF No. 93. Defendant's most coherent version of her argument is what follows in her reply:

> [The] confession was not voluntary.  She sat isolated in a government vehicle with two FBI agents for nearly an hour.  [Defendant's] confession was the result of the agents' conduct, and the agents' questions in English hindered [Defendant's] ability to comprehend the questions and competently communicate. The questioning of [Defendant] in English diminished [her] capacity to understand and diminished her ability to respond to the agents' questions.

> Though the agents suggest they had expectations that [Defendant] reads and understands English, the agents did not know how well she understands and commands English.  The fact that India is a former British colony lends no credence to the idea that people in India speak English.  That is just as ridiculous as saying Santa Ana, California was part of Mexico so people from Santa Ana should know Spanish.  Just because [Defendant's] children went to school in the United States has no bearing on the language she speaks at home, or to her children and relatives.  [Defendant] did not have to pass an English language exam to gain employment at Gardner.  [Defendant] failed the Dental Board of California's Registered Dental Assistant Law and Ethics exam because she did not understand the questions in English.

> The agents draw the conclusion based on whether [Defendant] did not read certain documents without recognizing she has limited English literacy skills.  To communicate with [Defendant], undersigned counsel requires the assistance of a Punjabi interrupter (sic), which the court also requires.  Dkt. 9.  What reasonable assurance can the court have that [Defendant] voluntarily waived constitutional right to remain silent when the incriminating statement was obtained without an interpreter?  The agents notes indicate Punjabi, and the agents were aware [Defendant] speaks another language.  A waiver of a constitutional right should come

24

1    with adequate assurances that the waiver is
2    voluntary.        [Defendant's]        ability        to
     comprehend and provide knowing and voluntary
     answer depends on her ability to understand
3    the    question    presented.    Essentially,
     [Defendant's] competence is in question when
4    she is not being assisted by an interpreter.

5    Def.'s Resp. 8:23-10:1.

6        In addition, [Defendant] is the victim of
         domestic    violence,    which    plagued    her
7        marriage,    culminating    in    her    ex-husband's
         arrest and prosecution, and their divorce.
8        As a victim of repeated domestic violence,
         including    psychological    abuse    and    sexual
9        violence [Defendant] may experience higher
         stress    levels    and    anxiety    in    stressful
10       situations (such as being questioned by law
         enforcement officers, who are questioning her
11       within the confines of a vehicle, after they
         have just escorted her from her workplace in
12       full    view    of    her    colleagues).    In order to
         endure    the    stressful    event,    [Defendant]
13       likely became compliant, agreeing to comply
         in all respects, including the signing of a
14       statement    in    English    which    she    could    not
         fully comprehend, for the sole purpose of
15       ending the stressful event.

16   Mot. Suppress Statements 6:21-7:6.  The Government counters:

17       In  this  case,  there  was  no  evidence  of
         physical    or    psychological    coercion.    The
18       agents never touched [Defendant].  They never
         threatened [her]. They merely asked questions
19       and [Defendant] answered them.  They did not
         try  to  trick  [her]  or  coerce  her  in  a
20       psychological  manner.    The  duration  of  the
         questioning  was  between  forty-five  minutes
21       and an hour so it was not overly long.    The
         Defendant  provides  no  evidence  to  the
22       contrary.    In  fact,  the  Defendant  in  her
         Motion admits that "the Agents demeanor and
23       communications  may  have  been  cordial"  and
         that the questions may have been "in a casual
24       tone."    Motion at 8.    Even in the <u>Fox</u> case
         Defendant  cites,  where  [a]  defendant  was
25       detained  for  four  and  a  half  hours  while
         armed officers performed a sweep of his boat,
26       was  questioned  twice,  and  was  confronted  with
         inculpatory information, the court held that
27       the  statement  was  voluntary  and  did  not
         violate the Fourteenth Amendment as his "will
28       was  not  overborne."  <u>Fox</u>, 216 F. Supp. 3d at

1233-34.

. . . [T]he circumstances of her interview show her will was not overborne. For example, [Defendant] did not provide all the information that the agents would have wanted. She did not provide Surjit's last name. Dkt. 93-2. She said that she did not read certain documents. Dkt. 93-2. If the agents were coercing the Defendant and the Defendant had become "compliant, agreeing to comply in all respects," her confession would have been a better one.

[Defendant]'s background and characteristics do not suggest that her will was overborne by the agents' cordial, casual questioning. [Defendant] was a woman in her late forties at the time of her interview. She was working as a long time dental assistant in an English speaking office. She had two children who were being educated in the United States. She had been formally educated in India. She had owned a home and purchased five more. She and her husband had separated several years before the interview. Contrary to what she repeatedly argues in her Motion, she spoke English. She was knowledgeable enough about the law to ask in English whether she needed legal representation and then in the next conversation with Special Agent Paulin to say she wanted an attorney.

Even the records of the Defendant's spousal abuse do not support her claim that her will was overborne. She had reached out to law enforcement herself as early as 1998. Dkt. 93-5. She sometimes stood up for herself with her husband and sometimes pressed charges. Dkt. 93-5. If a member of law enforcement asked her questions, she would sometimes decline to answer them if she wanted. Dkt. 93-5. For example, she declined to answer all of the questions she was asked about her husband. Dkt. 93-5. Contrary to the picture painted by [Defendant] in her Motion, she was not a woman who agreed to comply in all respects in the face of stress.

Once again, many of the cases cited by . . . Defendant are inapposite. For example, in United States v. Garibay, 143 F.3d 534, the case involved the waiver of Miranda rights

26

prior to a custodial interview. 143 F3d. 534, 538 (9th Cir. 1998). In that case, the defendant's IQ was "borderline retarded" and he had difficulty understanding the English language. Id. Here there is no evidence that the Defendant had a low IQ and the only evidence that she didn't speak English is that she uses an interpreter when speaking with her lawyer and she cannot pass a law and ethics exam (although she did appear to get the majority of the questions correct). In Blackburn v. State of Ala., 361 U.S. 199 (1960), the Court held a statement was involuntary when the defendant was insane at the time of the interview and the interrogation lasted between eight to nine hours in a tiny room which was sometimes filled with police officers. In [Defendant]'s case, there is no allegation that she is insane, that her interview lasted multiple hours, or that she was surrounded by police officers. In Henry v. Kernan, 197 F.3d 1021 (9th Cir. 1999), the Ninth Circuit held that a defendant's confession was involuntary when the interrogating officers ignored the defendant's "clear and repeated invocations of his Miranda rights" and made "misleading comments intended to convey the impression that anything said by the defendant would not be used against him for any purposes." Id. at 1027-28. One of the officers told the defendant that "what you say can't be used against you right now." Id. at 1027. Here, the Defendant did not invoke her Miranda rights and the agents did not make misleading comments to her.

Gov't Opp. 14:17-16:8.

The record reveals that the interview was cordial other than when Defendant was told "not to lie," Def.'s Decl. ¶ 10, to "take this seriously," Paulin Decl. ¶ 23, or that "this [is] a serious matter," Paresa Decl. ¶ 21, "that [she] could go to jail for 30 years," Def.'s Decl. ¶ 10, or that "it appeared [Defendant] had committed a crime," Paulin Decl. ¶ 23. In connection with one or more of these statements, "[Defendant] . . . became very emotional and cried. [The Special Agents]

27

questioned [Defendant] while [she] cried and after [she] stopped crying." Def.'s Decl. ¶ 10. Defendant also told the Special Agents several times during the interview that she "had to return to work but each time [they] told [her] they had more questions." Def.'s Decl. ¶ 11. The enquiry, then, is whether Defendant has characteristics such that the Special Agents' actions "overb[ore] [her] will to resist and [brought] about [a] confession[] not freely self-determined." Beckwith, 425 U.S. at 347-48 (quoting Rogers, 365 U.S. at 544).

Defendant indicates that consideration of the nature of the interview and her special characteristics evince that her statements were coerced. Specifically, she makes the unsupported argument that she may not have understood what the Special Agents asked her, see, e.g., Mot. Suppress Statements 4:4-9, and that her history of having been subjected to domestic abuse caused her to "bec[o]me compliant," Id. at 7:4. But the evidence shows that Defendant has an adequate grasp of the English language—at least for purposes of this enquiry. During the interview, "[Defendant] . . . responded [to questions] in English." Paresa Decl. ¶ 18. "[Defendant] spoke very good English" during the interview, "never said that she had difficulty speaking English," and "never said she needed an interpreter." Id.; see also Paulin Decl. ¶ 24. Defendant's former employer stated that during her employment "[Defendant] interacted with clients and staff in English," and that "the ability to read and write in English was a requirement of the job." Id. "She spoke English and wrote in patients' charts in English." Id. "[A]n individual who prepared tax returns for [Defendant] . . . said that . . . in the time

period of 2006-07, [Defendant] spoke and read English."   Id. ¶ 34.

Defendant's declaration attached to her Reply shows she has an adequate grasp of English.   She avers, for instance, that "[a]t the end of [the] meeting, one of the agents handed me a hand-written document.   The document only included some of my answers.   It did not include every question that was asked and every answer that I gave them."   Id. ¶ 12.   This assessment requires an understanding of the questions asked, the ability to read the document handed to her, and the ability to compare what was asked to what was written down.   Moreover, the entire declaration focuses on things that the Special Agents did and did not tell Defendant.

The record also supports the Government's contention that Defendant's will was not overborne in connection with her history of domestic abuse, and Defendant's indication that this abuse undermined her will when she made statements is unsupported by the evidentiary record.   As the Government indicates, the police records cast light on a person who, while at times reluctant to pursue prosecution of her spouse, was not afraid to pursue police intervention, organizational help, or emergency protective orders.   See Ex. D—Police Records, ECF No. 93-5.   The Government also correctly concludes that the record shows Defendant was not always compliant with police requests for information.   Id.   Defendant does not speak about her history of domestic violence in her declaration, and thus is silent as to whether this history has significance to the statements she seeks to suppress.   Instead, she argues in her motion, without

evidentiary or other support, that she "may experience higher stress levels and anxiety in stressful situations . . . . In order to endure the stressful event, [Defendant] likely became compliant, agreeing to comply in all respects . . . ." Mot. Suppress Statements 6:24-7:4. Unsupported statements and arguments in briefs are not evidence. See, e.g., Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc., 289 F.3d 589, 593 n. 4 (9th Cir. 2002) ("[A]rguments and statements of counsel are not evidence . . . ." (internal quotation mark and citation omitted)).

Although Defendant was never told she did not have to speak to the Special Agents or that she could leave at any time, the absence of this communication is not sufficient, under the totality of the circumstances, to render her statements involuntary. See, e.g., Bustamonte, 412 U.S. at 226-27 ("[N]one of [our decisions] turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances."). There are no facts in the record indicating that Defendant's age, education, or intelligence weigh in favor of finding her will was overborne. Although considered a neutral factor in the decision on whether Defendant was in custody for Miranda purposes, the interview here was not so long as to lead to the conclusion that Defendant's will was overborne. See, e.g., United States v. Plumman, 409 F.3d 919, 925 (8th Cir. 2005) (three and one-half hour interview).

For the stated reasons, the Government has met its burden of showing, by a preponderance of the evidence,

considering the totality of the circumstances, that Defendant's "statement[s] [were not obtained] by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Bautista, 362 F.3d at 589 (quoting Male Juvenile, 280 F.3d at 1022).

Lastly, Defendant requests an evidentiary hearing on her motion. However, "[a]n evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000). Here, the suppression record does not warrant conducting an evidentiary hearing and reveals that the suppression motion should be denied.

### III. CONCLUSION

For the stated reasons, Defendant's motion to suppress is denied.

Dated: September 29, 2017

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

31